Good morning, Your Honors. Good morning, Mr. Michael. May it please the Court, my name with the Office of the State Appellate Defendant, and I represent the defendant in this case, Mr. Carl Litwhiler, who's in the courtroom today for this proceeding. Your Honor, Your Honors, this case involves the dog sniff, and the question raised is whether the dog was reliable enough to have provided probable cause for the search of the vehicle, in this case, that yielded 28 pounds of psilocybin mushrooms, which prompted a motion to suppress, which was denied, and which resulted after a stipulated bench trial and a conviction of trafficking and a 12-year sentence. Today I'm going to ask the Court to reverse the trial court's denial of the suppression motion, because the court abused its discretion in denying the motion. In this case, the defendant was traveling his vehicle and alerted. Based on that alert, the vehicle was searched and the contraband was found. The suppression hearing was held to suppress that contraband, the evidence of that contraband, and the evidence at the hearing showed that the dog was certified and had been trained. The state presented that evidence. The defense then presented evidence showing field records, field performance records, which showed that the dog had, 1 third of his alerts were false positives. Also, a video was introduced into evidence showing the passes around the vehicle. Eventually, the judge denied the motion to suppress. I'm asking the court today to find that the dog was not reliable, that the state did not need its burden of establishing the dog was reliable, based on the field performance records and based on the video of the stop. The rules for the evidence that should be considered on motions to suppress involving a dog sniff were clarified by the Supreme Court in Florida v. Harris. There, the court stated that the procedure for the motions to suppress remain the same. If the defendant shifts the burden to the state, then the state has a burden of coming forth with evidence showing that there was probable cause for the search. In this case, my argument is that the burden was shifted with the field performance records showing that the dog gave false positives and with the video stop that point that I would like to address is that the defendant shifted the burden to the state. The state presented evidence that the dog had been certified and properly trained. Under Florida v. Harris, that's enough to establish that the dog is reliable enough to provide probable cause. However, Florida v. Harris also made it clear that the defendant can challenge that finding that the dog is certified, there's a presumption that he's reliable. In this case, the dog's certification was challenged with the field performance records. What did the Harris court say about field performance records? That they could be considered. But they said they weren't as reliable. That's correct. The fact that a dog alerts and the police don't find something doesn't mean it was a false alert. Yes, exactly. And here there was no evidence of controlled testing. But there were field performance records that can be considered in challenging cases where the dog is reliable. Now defense counsel in the trial court argued that the field performance records showed that the dog did not alert properly one third of the time. I went through the records myself. And based on my napkin calculations, the dog alerted 26% of his alerts could not be explained by residue. There was just no explanation for the alerts. There were false positives with no explanation based on residue. That's one out of four alerts was incorrect. There was no basis shown for the alert. That means that one of every four drivers that was subjected to a search based on this dog's alerts was subjected to a search that was not warranted. That I believe was sufficient to prompt further inquiry, the shifting of the burden, prima facie shifting of the burden to the state to then come in with the records of the dog's training to show that he had been properly trained and had performed well in the training, but the state failed to do so. So what we have now is that the dog is right three out of four times. Is there any law about what percentage you have to have? There is no law about that. So three out of four times the dog is right. They don't find anything one out of every four times. One out of every four times, without explanation. 36% of the time the dog alerted, it was a false positive, but there was an explanation for that. And that was that there was residue or the officer found some paraphernalia without any contraband. But one out of four, no explanation for the alert. Now my argument is that is enough to have shifted the burden to the state. What do you think percentage should be, 100%? You don't think that? No. 80%? Well, that is the question, and that gets to a policy argument that I want to make to the court. If the state had come in at that point with records of the dog's training, and those records show the dog was properly trained, this probably would have been an address. So I'm suggesting to the court that there's an incentive to have the state come in with the records showing that the dog was properly trained. Otherwise, every time we encounter one of these cases, because the percentage is uncertain, we have to file a brief, and that does not lead to judicial accounting. Now there's another factor. The dog was trained, yes. And was certified as trained. And my argument is that that training, under Harris that would be enough if it was not challenged. But in this case it was challenged by the number of false positives shown in the field performance report. But also by the video, which impeached the officer's explanation of how the dog alerted. But the video is a totally different kind of concept, isn't it? The video is, you're suggesting that the video impeaches the officer's testimony. That's your suggestion, isn't it? And it may be considered under Harris as my suggestion as well. Because Harris did not limit the other factors that could be used to challenge. But your argument is that when you watch the video, you see that you don't believe the officer. Right. What the dog did is not how the officer explained he alerted. The officer explained that the dog would square off to the spot where he smelled the concubine. That he would stay at that spot and look at it. And he would just stop and look at the spot. That's not what happened in this case. The video shows that the dog actually tried to walk past the officer both times. And when he alerted, the first time he did scratch. But when he alerted, he wasn't looking at his spot and staying there. He was looking at the officer as if he was being cued. Now, the video also shows that the officer blocked the dog both times. Hip checked him when the dog tried to walk around him. And lifted the leash, which suggests cuing. So the combination of one quarter of the alerts being false positives with no explanation for the alert, in combination with the video showing that the dog did not alert on his own the way that the officer said he should have alerted. Did they make that argument to the trial judge? Not the cuing argument. I believe this court can review it under the de novo standard of review that applies to probable cause determinations, to review probable cause determinations. However, the judge did view the videotape. I'm just seeing the police officer's credibility as whether he cued that dog or not would be one of those factors left, at least within reason to the trial judge. Setting aside the cuing argument, if we just focus on whether the dog alerted or not, whether the video showed that the dog alerted or not, the way that the officer stated he alerted, what the dog did on the video did not match the description of how the dog was supposed to alert, given by the officer. So the video shows that the dog did not alert, basically, in accordance with what the officer testified was an alert. So we have one quarter of the alerts being false positives with no explanation for them, and the dog not alerting the way that the officer said he should have alerted. Based on those factors, the burden was shifted to the state to then come in with the records, the training records, and show definitely that this dog had performed adequately in training, and the Supreme Court made clear that those are the best records for establishing the dog's performance. What we have in this case is a dog that is wrong one-fourth of the time and that did not alert the way that he was supposed to have alerted according to the handler. Based on that, I am arguing that that was enough to then shift the burden to the state. And the state should have then come in with the records, but the state did not do so, therefore the state did not meet its burden of showing probable cause in this case. Thank you. And because the state failed to show probable cause in this case, I am asking this court respectfully to reverse the circuit court's denial of this motion to suppress. Any questions? Thank you. Thank you, Mr. Pratt. May it please the court? Counsel? Lord and Michael, on behalf of the people, the issue in this case is whether the dog was sufficiently reliable in detecting drugs in order for his alert to provide probable cause to search the vehicle. A dog's reliability is a question of fact that's established by the Illinois Supreme Court in the Ludeman case and Cabal's case, so it's subject to the manifest weight of the evidence standard. And here the trial judge's finding of the dog's reliability was not against the manifest weight of the evidence. The defendant argues that additional evidence of reliability, specifically the dog's training records, were required to be introduced by the people because he introduced field performance records. But that's not consistent with the Harris framework. Under Harris, the state can show reliability through the certification and training records. Then the defendant has the opportunity to challenge that showing however they choose to. And after that, the trial judge weighs all of the competing evidence. So the consequence of any burden shifting is simply that the trial judge... What kind of proofs might a defendant come up with to show that he's in training? Well, as discussed in Harris, the defendant could cross-examine the witness. He could cross-examine about cueing. He could retain an expert. In this case, the defendant actually did retain an expert to look into cueing, to look over the performance records, to look over the field records, and make a challenge based on that. Or as in this case, he did attempt to challenge the reliability through the performance records, but that challenge just was not successful in this case. Because the performance records in this case actually bolstered the showing of reliability. So Harris disapproved of requiring any particular piece of evidence, and the trial judge is just to weigh all of the competing evidence. And weighing all of the competing evidence, in this case, the reliability was established. Trooper Fratsky had been a canine handler working with this particular dog wiper for over 10 years by the time of the stop. They'd gone through 10 weeks of training together at the Illinois State Police Academy, and then they were both certified. One is a handler, the other certified as a canine drug-detecting dog. And Viper was also recertified two times a year. He did scratch on his first pass. In watching the video, Trooper Fratsky did describe the dog's action as a scratch, verifying that it was the official alert. And defense counsel didn't challenge that that was a scratch below. Fratsky had also learned other keys through his decade of experience in working with the dog. And the video does show the dog exhibiting most of those other keys. He doesn't look at the spot, but he does bark. He does sit down and change his posture in front of the vehicle where he smelled the odor of narcotic. And he does have a breathing change. Well, you can't see from the video whether he has a breathing change or not, but Trooper Fratsky testified about the breathing change as well. Trooper Fratsky had complete trust in Viper, so he wouldn't usually ask for consent to search if the dog had not alerted. And he testified about the reliability staying consistent over time. The field reports did not show unreliability. They actually further showed reliability. They do not show a false positive rate of 33%, as Harris noted, because the dog alerts to the odor of narcotic rather than the narcotic itself. Just because contraband isn't found doesn't mean that the dog wasn't correct in alerting to the odor. It could be no longer in the vehicle. And Trooper Fratsky specifically testified that Viper would alert to residual odors. And from the People's Review of Performance Records, many of the times in which no narcotic was found, some explanation as to how residual odor, such as someone had been in the vehicle that smoked marijuana, was present. Only 14% of the time that I calculated did the driver not say anything as to information that would lead to how residual odors were present. The false negative rate, which is discussed in defendant's reply brief, the people actually did calculate it in this case, and it is zero. While Trooper Fratsky wouldn't ask for consent to search in the absence of an alert, he testified that other officers would, or sometimes officers would be looking for non-narcotic items, so they would ask for consent to search anyway. And 16 times in which the dog did not alert and a search was performed, no narcotics were located following that search. So that further indicates reliability. The find rate in this case was 67% as calculated by defense counsel at trial. And in the Foster case, which was cited by defendant, the court discussed a 66% find rate and stated that it confirms that the dog can accurately detect the odor of drugs as he was trained to do. So that 67% find rate, as in Foster, bolstered the reliability. Arguments based on cueing are entirely speculative at this point, because although defense counsel in the trial court did retain an expert to look into the possibility of cueing, that expert wasn't ultimately called, no argument was made on the issue, so it's just speculative at this point. Weighing all of the evidence, it supported the trial judge's finding of reliability, so the alert led to probable cause to search the vehicle, and this court should affirm the trial judge's denial of the motion to suppress. The defendant argues that there was enough there, at least the state, it was incumbent on the state to bring in the test results from the controlled, not the field experiences out in the real world, but the controlled testing, which the Supreme Court seems to think is the most reliable. Was it incumbent upon the state to bring records of that training or testing in, and why didn't they do it? The Harris case discusses how all that's required for showing a reliability of certification and training records. That was introduced. No particular piece of evidence is required, so there's no requirement to introduce the training records. The Supreme Court in Harris was actually disapproving of the cases which had required a mandatory checklist of evidentiary items. So in this case, when the state had introduced those items, and the field performance records only further showed reliability by showing the 67% find rate, and by showing no false negatives, there was really no reason to show further evidence of reliability when it hadn't really been challenged, or it had been challenged, but that challenge ended up providing more evidence of favorable reliability. Thank you, Mrs. DeMacro. Thank you. Mr. Santiago. Mr. Dragos. Thank you, Your Honor. I'm going to start off with 67%, 66% ratio. The state argues that in Foster, the Oregon Supreme Court case that I cited in my brief, that in that case the Oregon Supreme Court stated that a 67% accuracy rate established that the dog was accurate, but that is not a complete statement of what the court stated in that case. The complete statement in the context of that case, in that case the court found that the state had met its burden by bringing in the training records, something that did not happen in this case. And when discussing the 67% accuracy rate, the court said that was acceptable in connection with the evidence showing that the dog had performed well in training. We don't have that connection in this case, and the state didn't fully explain the context in which that 67% accuracy rate was set out in Foster. So to the extent that Foster suggests that 67% is good enough, that reasoning does not apply in our case, because in our case we don't have the 67% accuracy rate connected to records of the dog's training, as the court in Foster had. Your Honors, Justice Litton, you asked what kind of proof the defendant could bring in. The Supreme Court said that field performance records were acceptable, and other types of evidence as well. It was perfectly acceptable for the defendant to come into the case and present the field performance records as evidence to try and shift the burden, to show unreliability, and it was also acceptable for the public defender to come in with a video showing that the dog did not cue the way that he was supposed to have alerted. So ideally the state would come in with the training records. That would have been all that would have been necessary in this case if the training records showed that the dog was accurately trained. The importance of this case in a certain respect is that this court can encourage the state to put those records into evidence and eliminate the conflict that we have in this case, whether there's argument as to whether 67% is enough, whether 50% is enough. What's enough to be certified? Yes. What's enough to be certified? It's enough to be certified if the certification is not challenged. No, to be certified by that certification, by how many alerts, which percentage of correct alerts does the dog have to perform? Yes, if the state comes in with the evidence that the Supreme Court pointed out was the best evidence. I'm talking about to get the certification. Yes. I think what they're asking, I believe, is is there a pass-fail thing at the school? Well, the Helser case... And if so, where does that line go? I'm sorry, I misunderstood the question. Sorry, Your Honor. The Helser case actually discusses those standards in a very enlightening way. And those records in the Oregon case showed that the dog was essentially in training accurate 100% of the time. And if the state would have come in with those records in this case, and that's what the records would have shown, as I mentioned previously, this would have been an Anders. Any case in the future that brings in such evidence would be an Anders. So there's a policy reason for asking that the state produce these records once there's been a credible challenge to the reliability of the alert. And in this case, there was a credible challenge in the false positive ratio. Let me just ask, did the state fail to produce any records that the public defender requested? No, the state produced the records, the training records. Now, the public defender, he had the discretion to make strategic decisions, and he chose to challenge the presumption of reliability with the field records. At that point, and he could do that. At that point, it was incumbent on the state to then come in with the training records, which they had, and they did that. Did the public defender have them? He did have them, yes. Counsel, if you can. Thank you. I would just mention briefly that based on my calculations, I believe that the state's figures as to the dog's false positives were not correct. Officer Krafke testified that the dog became more reliable as he got older, which to me tells me that the dog was not reliable when he was younger. It's an admission that the dog was not reliable at some point. Is it possible for the dog to get better? It's possible for the dog to get better, I suppose. It defies common sense, I think. I wish I was getting better as I got older. In some ways, I think I am, but I hope I am anyways. In closing, Your Honors, I urge the court to reverse the denial of the defendant's motion to suppress. There was enough evidence in this case presented by the public defender to shift the burden to the state to then come in with the training records. I believe in the interest of judicial economy, it's important to encourage the state to come in with those records in dog sniff cases. Thank you. Thank you, Your Honors. I want to thank you both for your argument today. We will take this matter under advisement and get back to you as a written disposition within a short time. We'll now take a short recess for council.